Filed 6/28/22; opinion on transfer from Supreme Court

**CERTIFIED FOR PARTIAL PUBLICATION**\*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B293030 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA141014) |
| v. | |
| ANDRES LIMA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Allen J. Webster, Judge. Affirmed as modified and remanded for further proceedings.

C. Matthew Missakian, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews,

---

\*     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of the Discussion parts A, B, D, E, and F; Presiding Justice Rubin's concurring opinion is certified for publication in full. Justice Baker's concurring opinion is not certified for publication.

1

Idan Ivri, and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

## I.   INTRODUCTION

A jury convicted defendant and appellant Andres Lima of the attempted willful, deliberate, and premeditated murder of Israel R. (Pen. Code, §§ 664/187, subd. (a)[1]) and the assault of Omar O. by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)).  The jury found true the allegations that in the commission of the attempted murder, a principal personally used and personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (b)–(d) & (e)(1)) and defendant committed the offenses for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subds. (b)(1)(C) (attempted murder) & (b)(1)(A) (assault)).[2]  Defendant admitted he served two prior prison terms.  (§ 667.5, subd. (b).)  The trial court sentenced defendant to 32 years to life in state prison.

---

[1]     All statutory references are to the Penal Code unless otherwise noted.

[2]     The jury was unable to reach verdicts as to codefendants Daniel Gutierrez and Raymundo Hernandez, who also were alleged to have committed willful, deliberate, and premeditated attempted murder and assault by means of force likely to produce great bodily injury with the accompanying firearm and gang allegations, as well as other alleged enhancements specific to those defendants.

In his original appeal filed on October 4, 2018, defendant contended we must reverse his conviction for attempted murder in light of Senate Bill No. 1437 which abrogated the natural and probable consequences doctrine; even if Senate Bill No. 1437 did not abrogate the natural and probable consequences doctrine as to attempted murder, the trial court erred in failing to instruct the jury that a premeditated and deliberate attempted murder had to be a natural and probable consequence of the target crime; the prosecutor committed misconduct by using prospective jurors' comments to bolster the prosecution's factual theories and inflame the jury's passions and biases; remand was warranted to allow the trial court to exercise its discretion whether to strike the firearm enhancements pursuant to section 12022.53, subdivision (h); and he was entitled to 116 days of conduct credit.

On May 27, 2020, we remanded the matter to the trial court so it might exercise its discretion whether to strike any of defendant's section 12022.53 firearm enhancements, ordered the sentencing minute order modified to reflect that defendant was awarded 116 days of conduct credit, and affirmed the judgment in all other respects.

On August 19, 2020, the California Supreme Court granted defendant's petition for review. On January 5, 2022, the Supreme Court transferred the cause back with directions to vacate our decision and reconsider the cause in light of Senate Bill No. 775 (Stats. 2021, ch. 551).

On February 8, 2022, defendant filed a post remand supplemental brief in which he argues his attempted murder conviction must be reversed after enactment of Senate Bill No. 775 because it cannot be determined that the trial court's now erroneous instruction on attempted murder under the natural

and probable consequences doctrine was harmless beyond a reasonable doubt; Senate Bill No. 775 renders moot his instructional error argument concerning premeditated and deliberate attempted murder and the natural and probable consequence doctrine; and the criminal street gang and firearm sentence enhancements must be reversed in light of Assembly Bill No. 333 (2021–2022 Reg. Sess.).

## II.   BACKGROUND[3]

A.   *The Prosecution's Case*

### 1.   The Fight and Shooting

At around 10:00 a.m. on July 17, 2016, 16-year-old Israel O. had a dispute on Facebook with another minor, Miguel R., during which Miguel challenged Israel to a fight at the Rosecrans Recreational Center, a park.  Israel agreed.  Israel wanted "backup," so he asked his brothers Aaron O. and Omar O. and Omar's friend Alvaro Q. to accompany him.[4]  At about 12:45 p.m. that day, Israel and the others went to the Rosecrans Recreational Center.

---

[3]   Because Gutierrez and Hernandez are not parties to this appeal, our recitation of facts focuses on those related to defendant and the issues he raises on appeal.

[4]   Israel testified that he did not tell his brothers that he was going to the park to fight someone because he believed they would not take him.  Omar testified that Israel told him about the planned fight with Miguel.

4

The Rosecrans Recreation Center was in the Gardena 13 gang's territory. Neither Israel nor Miguel was a gang member. Omar, Aaron, and Alvaro also were not gang members.

After arriving at the park, Israel and the others sat on a bench. Israel got up to put his sweatshirt in Aaron's car. As Israel walked to Aaron's car, two groups of people approached him. The groups totaled 10 people and consisted mostly of Hispanic males. Defendant approached Israel and said, "'Where the shoelaces at?'" "Shoelaces" was a derogatory term that referred to South Los gang members. South Los and Gardena 13 were rival gangs. Defendant then asked Israel where he was from. Israel, who understood defendant to be asking to which gang he belonged, did not respond. Defendant punched Israel in the face multiple times. Israel defended himself.

Omar and Aaron ran to assist Israel and became involved in fights with defendant's companions. Omar approached the group and said, "[W]hoa, stop, what's happening?" He heard someone say "'Nah, fuck that'" and was then struck in the face and the back of the head, multiple times, by two of defendant's companions. Omar could not identify his attackers. He suffered a cut to his left eyebrow and lost vision in his left eye for some period of time.

Aaron heard defendant say, "'This is Gardena.'" Aaron responded, "'I don't bang.'" Alvaro saw a man other than defendant make a gang sign with his hand and heard him say, "'Gardena'" and "'Fuck your dead homies.'"

At the same time, Alvaro approached Miguel, whom he knew, to ask what was taking place. They argued and attempted to fight, but a woman with a baby interceded.

At some point, defendant picked up Israel by the legs and slammed him to the ground. Defendant picked up Israel again and pinned his arms behind his back. On direct examination, Israel testified that defendant then said, "'Get the burner.'" Israel understood a "burner" to be a gun. On cross-examination, Israel testified he was not sure if he heard the word "burner" or if defendant used that word. On redirect examination, Israel explained that he was having trouble remembering, given the passage of time. When he told a detective in July 2016 that defendant said, "'Get the burner,'" he was very clear.

Omar testified that he heard defendant say, "'Get the burner, get the burner, come shoot him.'" Aaron testified that he heard defendant or one of his codefendants say something like, "'Take out the strap,'" or "'Take out the burner.'" He understood "strap" or "burner" to be a gun. Aaron heard defendant say—referring to Israel—"Shoot him . . . ."

A juvenile, Leonardo E., shot Israel in his lower abdomen. Leonardo said something about the number 13, and defendant and his companions ran away.

A three-second video of part of the incident at the park was provided to the police. Los Angeles Police Department Detective Christian Mrakich showed the video to Gardena Police Department Officer Jason Hooker and Los Angeles Police Department Officer Joseph Chavez who identified, among others, defendant and Leonardo from the video.

2.    Gang Evidence

In July 2016, Officer Hooker worked in a unit that handled all gang-related crimes in Gardena. Gardena 13 was the largest

gang in Gardena. The number 13 in the gang's name showed it was "paired up" with the Mexican Mafia. Officer Hooker opined that defendant and Hernandez were members and Leonardo was an associate of the Gardena 13 gang.

Officer Chavez testified as the prosecution's gang expert. As a member of the Los Angeles Police Department's gang unit, one of the gangs he was assigned was the Gardena 13 gang. Officer Chavez opined that Gutierrez was an associate and defendant, Hernandez, and Leonardo were members of Gardena 13. Defendant and Hernandez stipulated that they were members of Gardena 13.

Officer Chavez testified that the inquiry, "'Where are you from'" is gang-related and usually leads to a confrontation or an altercation. According to Officer Chavez, veteran gang members use juvenile gang members—veterans know that juveniles will not receive the same punishment for committing the same crimes as adults. "Up-and-comer[s]" in a gang "have to show that they're willing to do what the older members ask of them and be who the older members want them to be."

The prosecutor gave Officer Chavez a set of hypothetical facts based on the facts in this case and asked if the attempted murder and assault were committed for the benefit of, at the direction of or in association with the Gardena 13 gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. Officer Chavez testified that the shooting in the hypothetical was committed for the benefit of, in association with, and at the direction of Gardena 13.

B.    *The Defense Case*[5]

Martin Flores testified as a gang expert for Gutierrez.[6]  He testified that he was one of 12 non-law enforcement gang experts on the Los Angeles County Superior Court's panel.  He grew up in East Los Angeles where he was exposed to gangs.  As an adult, he worked throughout Los Angeles County to divert young people from gang participation.  Later, he worked with high risk and incarcerated young people through a conference he developed called "Wake Up, It Ain't No Game."  Flores "work[ed] a lot" as a gang expert and earned $220,000 the previous year.

Flores testified he was familiar with the case.  He had read the police reports and listened to some of the testimony.  He opined that simply because Gutierrez lived in an area where gang members lived and spoke to people in that area did not make Gutierrez a gang associate.  Flores believed that Gutierrez was not a Gardena 13 associate or member.  Gutierrez was not at the Rosecrans Recreational Center in a gang capacity; he was there with other members of the community, a couple of whom had gang histories.  Like Gutierrez, those community members were not at the park in a gang capacity.

Flores explained that the fight and shooting resulted from a personal conflict and were not gang related.  The victim and his companions were not gang associates or members.  Leonardo did

---

[5]    None of the defendants testified at trial.  Neither defendant nor Hernandez called any witnesses.

[6]    Derek Ibanez also testified for Gutierrez.  Because his testimony is not relevant to the issues on appeal, we do not summarize it here.

not have gang tattoos and testimony about his gang status was speculation.

On cross-examination, the prosecutor told Flores to assume that the first thing the person who was shot was asked was, "Where are you from?"; Gutierrez was actively involved in the fight and threw punches; he threw up a "G"; he said, "Gardena"; he said, "[F]uck your dead homies" at the beginning of the fight; and he said, "[S]hoot him" and asked if that was enough to change his opinion that Gutierrez was not a gang associate or member. Flores said it would not change his opinion without further information. Flores explained that the inquiry, "'[W]here are you from?'" is not automatically a gang challenge and may be an attempt to recall a person's identity.

## III. DISCUSSION

### A. *Senate Bill No. 775*

On October 5, 2021, during the pendency of this appeal, the Governor signed Senate Bill No. 775 which sought to "clarif[y] that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (Sen. Bill No. 775 (2021–2022 Reg. Sess.), as amended October 5, 2021, p. 3; Stats. 2021, ch. 551, §§ 1–2.) Section 1170.95's amendments became effective January 1, 2022. Section 1170.95, subdivision (g) provides that a person whose conviction for attempted murder is not final may challenge on direct appeal the

validity of that conviction based on the changes made to sections 188 and 189 by Senate Bill No. 1437.

The trial court instructed the jury on two theories of attempted murder:  direct aiding and abetting and natural and the probable consequences doctrine.  (CALCRIM Nos. 400 [Aiding and Abetting:  General Principles]; 401 [Aiding and Abetting: Intended Crimes]; 403 [Natural and Probable Consequences Doctrine (Only Non-Target Offenses Charged)].)  Defendant concedes that direct aiding and abetting remains a valid theory of guilt after enactment of Senate Bill Nos. 1435 and 775.  The parties agree that the natural and probable consequences doctrine is no longer a valid theory of guilt for attempted murder. The parties also agree that when a court instructs a jury on both a valid theory of guilt and an invalid theory of guilt we review the error under the "harmless beyond a reasonable doubt" standard established in *Chapman v. California* (1967) 386 U.S. 18, 24.) (*People v. Aledamat* (2019) 8 Cal.5th 1, 3 (*Aledamat*).)  Employing that standard, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt."  (*Ibid.*)

1.    Background

The trial court instructed the jury with CALCRIM No. 601 as follows:  "If you find the defendant guilty of attempted murder on a theory of Aiding & Abetting as described in Jury Instruction 401, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation."

10

In her closing argument to the jury, the prosecutor explained that if the jury found defendant guilty under an aiding and abetting theory, then it had to decide whether the attempted murder was willful, deliberate, and premeditated. If it found defendant guilty under the natural and probable consequences doctrine, then it did not "move on to willful, deliberated, and premeditated."

The trial court provided the jurors with two verdict forms for count 1, one each for a finding of guilty and not guilty, and two verdict forms for count 3, one each for a finding of guilty and not guilty. The verdict form for guilty on count 1 was comprised of six paragraphs, the first of which stated: "WE, THE JURY IN THE ABOVE-ENTITLED ACTION, FIND THE DEFENDANT, ANDRES LIMA, GUILTY OF THE CRIME OF ATTEMPTED MURDER, IN VIOLATION OF PENAL CODE SECTION 664/187(a), A FELONY, AS CHARGED IN COUNT 1 OF THE INFORMATION, WHO DID UNLAWFULLY AND WITH MALICE AFORETHOUGHT ATTEMPT TO MURDER ISRAEL R.O., A HUMAN BEING ON OR ABOUT JULY 17, 2016, IN THE COUNTY OF LOS ANGELES."

The second paragraph of the guilty verdict form for count 1 stated, "IT IS FURTHER ALLEGED THAT THE AFORESAID ATTEMPTED MURDER WAS COMMITTED WILLFULLY, DELIBERATELY AND WITH PREMEDITATION. [¶] WE FIND THIS ALLEGATION TO BE TRUE OR NOT TRUE (CIRCLE ONE)" The remaining paragraphs required that the jurors either find true or not true the other sentencing allegations that had been charged against defendant.

11

The guilty verdict form for count 3 was comprised of two paragraphs, the second of which required that the jurors either find true or not true the gang enhancement allegation.

The trial court instructed the jury that "You'll be given verdict forms, some time after you started deliberating. As soon as all jurors have agreed on a verdict, the [fore]person—this time it's the foreperson. No one else, but the foreperson—must date and sign the appropriate verdict form and notify the bailiff." And, although the court had earlier advised the jurors that "all forms must be completely filled out," it did not advise the jurors that they needed to circle true or not true on the sentencing enhancements.

After the jurors indicated that they had reached verdicts, the court clerk began to read the guilty verdict on the attempted murder charge. But when she read the second paragraph that was supposed to include a circle either finding true or not true the premeditation allegation, the clerk stopped, informing the trial court that "it wasn't circled." The court observed, "I thought it was circled at the bottom." The clerk responded, "These are not circled." The court replied, "Yeah, okay. Okay. [¶] You [*sic*] not quite—this is not completed. You got to go back and complete them. [¶] Okay. All of the jurors have to go. [¶] Read them carefully and circle them and come back." Within minutes,[7] the jury completed the verdict forms, including by circling the part of

---

[7]     The record also indicates that the jurors had failed to complete the guilty form as to count 3 as the clerk's transcript stated, "it is determined that verdict*s* are not complete" and then later, that the jury had "indicate[d] that the verdict form*s* are now complete." (Italics added.) The clerk initially began reading the verdicts at 2:10 p.m. At 2:20 p.m., the jury indicated it had completed the verdict forms.

the form indicating that it found true the allegation that the attempted murder was committed willfully, deliberately, and with premeditation. The jury also circled "true" for all the remaining sentencing enhancement allegations for count 1 and count 3.

    2.    <u>Analysis</u>

Defendant contends that because the jury originally left blank the willful, deliberate, and premeditated allegation finding, the jury necessarily based its attempted murder verdict on the natural and probable consequences doctrine; such a conclusion is consistent with CALCRIM No. 601 and the prosecutor's closing argument. He argues it is unrealistic to conclude that if the jury relied on the natural and probable consequences doctrine to convict him of attempted murder and thus deliberately left blank the willful, deliberate, and premeditated allegation on the verdict form, the jury would have challenged the trial court when it told them to return to the jury room and complete the verdict form as to that allegation. We disagree.

The record demonstrates the jury's failure to fill out the verdict forms fully was inadvertent. First, the jurors failed not only to complete the verdict form as to the premeditation allegation but failed also to complete the verdict form as to any of the other sentencing allegations, including firearm allegations for which there is no dispute there was overwhelming evidence. Further, it took only 10 minutes for the clerk to read the verdict form initially, the trial court to address the matter and instruct the jury to return to the jury room and complete the verdict forms, and the jury to return to the jury room and complete the

13

verdict forms. If the jury had based its attempted murder verdict on the natural and probable consequences doctrine, it would not have circled the true finding on the willful, deliberate, and premediated allegation so quickly. Rather, the jury would have spent time discussing how to respond to the court's erroneous instruction and would have sent the court a request to clarify its instruction—on several occasions, the jury requested the court provide assistance in its deliberations.

Defendant further contends that the "strong indication that the jury *actually* relied upon natural and probable consequences also establishes—based on the unique instructions used and the arguments made here—that the jury was *not* convinced of the case for direct aiding and abetting." According to defendant, the prosecutor made clear in closing argument that the prosecution preferred an aiding and abetting conviction to a natural and probable consequences conviction and the natural and probable consequences theory therefore was "similar" to a lesser included offense. He concludes that if "the prosecution's evidence of direct aiding and abetting was strong enough, the jury would have rewarded that evidence with the convictions the prosecution was asking for."

The evidence of direct aiding and abetting was overwhelming. The evidence showed that defendant approached Israel and issued the gang challenge, "'Where you from?'" Israel did not respond, and defendant attacked him. After slamming Israel to the ground, defendant picked up Israel and held his arms behind his back. Then defendant or one of his companions called for someone to get a "burner"—i.e. a gun. Defendant told Leonardo to shoot Israel. Defendant held Israel while Leonardo shot Israel. Law enforcement identified defendant from the

14

three-second video, other witnesses identified him and described his role in the fight and shooting before and at trial.

Accordingly, the trial court's error in instructing the jury on natural and probable consequences was harmless beyond a reasonable doubt. (*Aledamat, supra*, 8 Cal.5th at p. 3.)

B.    *The Trial Court's Failure to Instruct on Premeditation and Deliberation*

In his original appeal, defendant contended that if we did not hold that Senate Bill No. 1437 abrogated the natural and probable consequences doctrine as to attempted murder, we still had to reverse his conviction for willful, deliberate, and premeditated attempted murder because the trial court erred in failing to instruct the jury that *premeditated* and *deliberate* attempted murder had to be a natural and probable consequence of the target crime. In his supplemental brief, defendant asserts that this contention is moot in light of Senate Bill No. 775, which "clarifie[s]" that a defendant may not be convicted of attempted murder on a natural and probable consequences theory. We agree.

C.    *Prosecutorial Misconduct*

Defendant argues that the prosecutor committed misconduct when she referred to prospective jurors' comments in her rebuttal argument to bolster the prosecution's factual theories and inflame the jury's passions and biases. We agree that the prosecutor committed misconduct, but conclude the misconduct was not prejudicial.

15

1.    Background

During her rebuttal argument, the prosecutor addressed the testimony of Flores, Gutierrez's gang expert. She noted that Flores "pretty much would not say that this was a gang crime on any level with any facts." The prosecutor then said she wanted to direct the jury's attention to jury selection, stating that "some of the things that the perspective [*sic*] jurors said during that conversation, if you were listening carefully, are the exact concepts we are dealing with in this case."[8] She then said to the jury:

"How about the man who talked about his special needs son who was crossing the street. And he was hit up by a group of guys who said where you from, before they shot him five times and he still has five bullets in his body.

"How about the woman who said her god daughter's sister was part of a gang and that gang was called Gardena 13. We hadn't even mentioned what gang was involved in this case.

"How about the guy who went to Vegas, remember him."

Defense counsel objected, "Objection, your Honor, [Evidence Code section] 352." The trial court overruled the objection stating, "Argument of counsel is not evidence. Evidence is that which has been testified to, stipulations[,] and exhibits. And you've had a combination of all three."

The prosecutor resumed her argument:

---

[8]    Only portions of the jury voir dire are in the record on appeal, so we are unable to determine the accuracy of the prosecutor's characterizations of the prospective jurors' responses. In any event, defendant does not challenge the accuracy of the prosecutor's recitation of voir dire.

16

"How about the man who went to Vegas. Remember him. He was pretty likeable. And he talked about gangs because he grew up around gangs and he told you the veteran gang members make the younger gang members prove themselves and they prove themselves by committing crimes.

"Now, the defense wants you to think that Martin Flores is a true gang expert. These concepts are basic and they are things that people are dealing with in the community. I didn't even need to bring a gang expert in here to explain some of these concepts. But Officer Chavez is a police officer who is risking his life every day in this neighborhood to protect the community against gang crimes. But I guess they don't want you to think that he's an expert. They want Martin Flores, who is paid $220,000 a year to testify for the defense to explain to you that this isn't a gang crime. That is not credible. And you know that."

Later, discussing whether prosecution witnesses had motives to lie, the prosecutor said to the jury, "What is the motive to lie for these kids. Honestly. Do you think they want to be here? You think they want to be going through this? You think they want to sit on that witness stand and identify known gang members? There was a very powerful moment in this trial where I was asking [a witness] what his concerns were. And he said it in a way that I wouldn't necessarily say it and maybe you wouldn't say it. I would probably just say straight out, I'm scared of retaliation. What he said, though, was so powerful. He said, I'm afraid that what I say up here, is going to affect me out there.[9]

---

9     During direct examination, the prosecutor had asked Aaron if he was nervous about testifying. Aaron responded that he was. The prosecutor asked what caused him to be nervous. Aaron

"And if there is one thing that you all can agree on, [it] is that witnesses who testify in gang cases, do get retaliated against. Do you remember the young girl, she was sitting right here. She was very sharp. She was the one that ditched school to go to Starbucks. She was talking about her friend in Carson, who was killed on his door step. She was like, I know who did it. I know who did it and the police are not arresting them and she [was] frustrated. But then when I asked her, did you pick that person out of a photo?

"Yes, I told them.

"Okay, are you willing to go to court?

"No. She wanted nothing to do with that responsibility. Why? Because it [is] scarry [*sic*]. Because gang cases are scarry [*sic*]. And, so, you think these witnesses are going to come in here, that they're going to point people out in sic-packs [*sic*] and they're going to identify these defendants. If they are lying, what do they have to gain from that? Nothing."

Later, the prosecutor, discussing gang culture, said, "[Defense counsel] got up here, at the very beginning of the defense's argument and he said oh, you know, a young man got shot. And there's a cultural [*sic*] out there. Kind of breezed by it. But let's talk about the culture. And this is where I'm going to end. There is a culture of adult gang members, making juveniles commit their crimes. Why? Because gangs want to stay in business. They want to keep doing what they do, which is engage

_____

responded, "Just saying something I shouldn't." The prosecutor asked, "And when you say that you're worried about saying something you shouldn't say, what do you mean?" Aaron answered, "I just don't want to say anything that's going to put my life in threat." The prosecutor asked, "So you have a fear of retaliation?" Aaron responded, "Yes."

in violence on our sheets [*sic*].  And the way they're going to do it, is they're going to target our youth.  They're going to go after the young boys and girls of our communities.  They're going to go after the teenagers and they're going to make them do their dirty work.  And that's exactly what these three defendants did.  And they should be ashame[d] of themselves."

After returning from a lunch recess, defense counsel moved for a mistrial, arguing that several parts of the prosecutor's argument were inflammatory and misconduct including, as relevant here, her reference to gang shootings that were not part of the trial evidence and to the statement by the prospective juror who "went to Vegas" and had grown up around gangs that veteran gang members made younger gang members prove themselves by committing crimes.  The trial court denied defendant's mistrial motion, ruling the jury had heard about the other shootings and the prospective juror's comment about the actions of "veteran gang members" during voir dire.

### 2.    Standard of Review

A claim of prosecutorial misconduct is governed by the abuse of discretion standard of review.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)  "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.]  In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.  [Citation.]"

(*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

### 3. Analysis

"""""A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.] In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.""""" ([*People v. Powell* (2018) 6 Cal.5th 136,] 172.)" (*People v. Hoyt* (2020) 8 Cal.5th 892, 943.)

"It is well settled that it is misconduct for a prosecutor to base argument on facts not in evidence. [Citation.]" (*People v. Mendoza* (2016) 62 Cal.4th 856, 906.) Similarly, it is misconduct for prosecutors to "quote individual jurors in their argument to the entire jury." (*People v. Freeman* (1994) 8 Cal.4th 450, 517.) Nevertheless, "'it does not follow that such conduct is necessarily prejudicial in any given case.' [Citations.]" (*Id.* at p. 518.)

### a. Forfeiture

"[T]o preserve a claim of prosecutorial misconduct for appeal, ""a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.'" [Citation.] The lack of a timely

20

objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' [Citation.]" (*People v. Hoyt, supra*, 8 Cal.5th at pp. 942–943.)

On appeal, defendant contends the prosecutor's references to statements by prospective jurors were impermissible because those statements were not evidence admitted at trial. Those statements concerned (1) the man with the special needs son who was asked, "'Where you from?'" before being shot, (2) the woman whose goddaughter's sister was part of the Gardena 13 gang, (3) the man who had grown up around gangs and said that veteran gang members made younger gang members prove themselves by committing crimes, and (4) the woman who was afraid to testify about a gang killing. Defendant further contends the prosecutor improperly argued that "guilty verdicts would help reduce the ability of gangs to 'target our youth,' 'go after the young boys and girls of our communities' and 'go after the teenagers and . . . make them do their dirty work.'"

The Attorney General argues that defendant forfeited most of his claims on appeal because he failed to object on the same grounds and request an admonition in the trial court. Defendant argues there was no forfeiture because any objection would have been futile as the trial court had instructed the attorneys to not interrupt each other's arguments with objections "if at all possible" and it overruled defense counsel's first objection to the prosecutor's argument.

In defense counsel's motion for a mistrial, he initially argued, "I think that it was highly prejudicial, inflammatory and misconduct for the prosecutor to bring in statements about other shootings, other gang shootings, other gun incidents outside this

21

court, referring to mask [*sic*] killings, I believe. And I believe that . . . was strictly inflammatory and I would be moving for mistrial on behalf of [defendant] based upon that." During argument on his mistrial motion, defense counsel added, "But with that statement, a man went to Vegas . . . and [what] she's talking about . . . brings that into context with veteran gang members . . . and comparing what they do with new or young gang members, that's not a part of this case and I think was improper and insightful [*sic*] to bring that up."

Defendant's failure to object timely, or at all, in the trial court to the references to the prospective juror whose goddaughter's sister was part of the Gardena 13 gang or to the need for guilty verdicts to impede the ability of gangs to "'target our youth'" to make them do the gang's "'dirty work'" forfeits these claims on appeal. (*People v. Hoyt, supra*, 8 Cal.5th at pp. 942–943.) The futility exception to the forfeiture rule does not save these claims. That exception applies in "unusual" or "extreme" circumstances like those in *People v. Hill* (1998) 17 Cal.4th 800, 821, 826 where defense counsel's failure to object was excused by the prosecutor's "continual misconduct, coupled with the trial court's failure to rein in her excesses, [which] created a trial atmosphere so poisonous" that further objections "would have been futile and counterproductive" to the defendant. (*Id.* at p. 821; see also *id.* at p. 836.) No such "unusual" or "extreme" circumstances were present here.

Defendant's motion for mistrial as to the remaining claims—the references to the man with the special needs son who was shot after being asked, "'Where you from?,'" the man who spoke about veteran gang members making younger gang members prove themselves by committing crimes, and the

woman who was afraid to testify about a gang killing—was sufficiently timely to preserve these claims for appeal. (See *People v. Peoples* (2016) 62 Cal.4th 718, 801 [the failure to object timely to prosecutorial misconduct did not result in forfeiture where defense counsel moved for a mistrial the following day— before defense closing arguments began—thus giving the trial court the opportunity to admonish the jury before deliberations began].)

      b.      Merits

As noted, after application of the forfeiture doctrine, defendant's remaining misconduct claims concern the prosecutor's references to the man whose special needs son was shot after being asked, "'Where you from?,'" the man who spoke about veteran gang members making younger gang members prove themselves by committing crimes, and the woman who was afraid to testify about a gang killing. We agree with defendant that the prosecutor, during closing argument, improperly argued facts not in evidence (*People v. Mendoza, supra*, 62 Cal.4th at p. 906) and improperly quoted individual jurors (*People v. Freeman, supra*, 8 Cal.4th at p. 517). But the misconduct was harmless in light of the overwhelming evidence of guilt adduced at trial.

As we explained above, the evidence that defendant aided and abetted a willful, deliberate, and premeditated murder was overwhelming. In addition to the evidence supporting a direct aiding and abetting theory, which we discuss above, law enforcement identified defendant from the three-second video,

23

other witnesses identified him and described his role in the fight and shooting before and at trial.

Defendant argues that to the extent the jury relied on a direct aiding and abetting theory, it was a close case because the testimony that suggested defendant said somebody should get a gun was "very uncertain." He reasons that the jury's failure to convict either Gutierrez or Hernandez "suggests that [defendant's] mere participation in the fight would not have been enough to convince the jury that he aided and abetted the shooter."

Even without evidence that defendant called for someone to get a gun, the case for direct aiding and abetting was not close. Contrary to his assertion, defendant did not "mere[ly] participat[e] in [a] fight." He was the primary actor in the assault on Israel. He approached Israel, issued a gang challenge, repeatedly struck Israel, and held Israel's arms behind his back— after someone called for a gun—while Leonardo shot him.

Moreover, the fact that the jury did not convict Gutierrez or Hernandez tends to demonstrate that the jury did not rely on any improper remarks by the prosecutor. The prosecutor made the challenged remarks generally and not specifically in reference to defendant. Had the jury relied on any improper remarks in convicting defendant, it would have also convicted Gutierrez and Hernandez.

Finally, the trial court instructed the jury that the attorney's arguments were not evidence. We presume the jury understood and followed the court's instructions. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1178, overruled on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

24

D.  *Assembly Bill No. 333*

Defendant contends that in light of Assembly Bill No. 333's changes to section 186.22, we must reverse the true findings on the criminal street gang and firearm enhancements.  The Attorney General agrees as do we.

Assembly Bill No. 333 narrowed section 186.22's definition of a "'criminal street gang'" and altered the section's requirements for proving a "'pattern of criminal gang activity.'" (*People v. Lopez* (2021) 73 Cal.App.5th 327, 344–345 (*Lopez*).)  We agree with the parties that Assembly Bill No. 333, which took effect on January 1, 2022, applies retroactively to defendant's non-final appeal.  (*Lopez, supra*, 73 Cal.App.5th at pp. 343–344.)

Defendant argues the prosecution presented insufficient evidence to show Gardena 13 is a criminal street gang or engages in a pattern of criminal activity under Assembly Bill No. 333's amendments to section 186.22.  The Attorney General disagrees that the prosecution's evidence was insufficient to show Gardena 13 is a criminal street gang, but concedes that the evidence was insufficient to show a pattern of criminal activity under the amended statute.

"When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand.  (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 71–72 & fn. 2 . . . .)  Such a retrial is not barred by the double jeopardy clause or ex post facto principles because the question of whether [the evidence established the new element] was not relevant to the charges at the time of trial and accordingly, this question was never tried.  (See [*Id.*] at pp. 69–72 & fn. 2.)" (*People v. Eagle* (2016) 246

25

Cal.App.4th 275, 280.) Accordingly, we vacate the true findings on the criminal street gang enhancements and remand with directions to permit the prosecution to retry those enhancements under the current law if it so elects. (*Ibid.*)

Defendant next argues that because the true findings on the firearm enhancements depended on true findings on the criminal street gang enhancements (see § 12022.53, subds. (b), (c), (d), and (e)(1)) which we must reverse, we also must reverse the true findings on the firearm enhancements. Again, the Attorney General agrees as do we. Accordingly, we reverse the firearm enhancements, but note they are subject to reimposition if the prosecution retries the criminal street gang enhancements.

E.    *Senate Bill No. 620*

Under section 12022.53, subdivision (h),[10] (which became effective January 1, 2018, pursuant to Senate Bill No. 620 (Stats. 2017, ch. 682, § 2)), a trial court may strike a section 12022.53 firearm enhancement in the interest of justice. In his original appeal, defendant contended the trial court made two errors in exercising its section 12022.53, subdivision (h) discretion. First, in imposing the 25-years-to-life subdivisions (d) and (e)(1) enhancement, it relied on the fact that the case was serious, gang-related, and involved a shooting when that enhancement

---

[10]    "The court may, in the interest of justice pursuant to [s]ection 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (§ 12022.53, subd. (h).)

can only be imposed in a serious, gang-related case that involves a shooting. Second, the record suggests the court was unaware that it could strike the subdivisions (d) and (e)(1) enhancement and impose a lesser enhancement under subdivisions (b) or (c) and (e)(1). Because we reverse the firearm enhancements as we explain above, defendant's contention is now moot.

F.    *Conduct Credit*

At defendant's sentencing hearing, the prosecutor appears to have argued that defendant was not entitled to any conduct credit because he was sentenced to a life term. The trial court stated that it did not believe that defendant was entitled to conduct credit and awarded defendant 777 days of presentence custody credit and no days of conduct credit.

Section 2933.1, subdivision (c) limits the presentence conduct credit a defendant convicted of a violent felony may receive to 15 percent of the defendant's actual presentence custody. Section 2933.2, subdivision (a) prohibits an award of conduct credit to a defendant convicted of murder. As the Attorney General notes, section 2933.2, subdivision (a) does not apply to attempted murder.

Defendant argues that his conviction for a violent felony[11] limits his conduct credit to 15 percent of his actual presentence custody, but his life term does not bar an award of any credit. Citing *People v. Duff* (2010) 50 Cal.4th 787, 793 ["The circumstance that a defendant is sentenced to an indeterminate

---

[11]    Violent felonies under section 667.5, subdivision (c) include attempted murder ((c)(12)) and any violation of section 12022.53 ((c)(22)).

27

sentence does not preclude the earning of presentence conduct credit"], the Attorney General agrees.  So do we.  Accordingly, defendant is entitled to 116 days of conduct credit.  (*People v. Ramos* (1996) 50 Cal.App.4th 810, 816 [a defendant is entitled to the greatest whole number of days that does not exceed 15 percent of his actual presentence custody].)

# V.    DISPOSITION

The true findings on the criminal street gang and firearm enhancements are reversed.  The matter is remanded to the trial court to permit the prosecution to retry the criminal street gang enhancements if it so elects.  If after retrial the criminal street gang enhancements are found true, the court is to resentence defendant on the criminal street gang enhancements and, exercising its discretion, on the firearm enhancements.  Whether or not the prosecution retries the criminal street gang enhancements, defendant's sentence is to include an award of 116 days of conduct credit.  In all other respects, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

KIM, J.

We concur:

RUBIN, P. J.

BAKER, J.

## People v. Lima -- B293030

RUBIN, P. J. – Concurring;

I have signed the majority, but I write separately to express additional thoughts about the prosecutorial misconduct in this case. The prosecutor made a conscious decision that she would structure at least part of her rebuttal argument along the line that seemingly much of the evidence in the trial conformed to the experiences with, and fear of, gangs that several of the prospective jurors had expressed earlier in voir dire. Twenty-six lines of reporter's transcript into her rebuttal argument, the prosecutor harkened back to the lengthy voir dire process. She then argued, "And some of the things that the perspective [*sic*] jurors said in that conversation, if you were listening carefully, are the exact concepts we are dealing with this case." Her first example was the prospective juror whose son was crossing the street. Gang members threatened the son and shot him five times.

This was not just an isolated moment of overzealousness at the end of a stressful attempted murder trial. Instead, the prosecutor proceeded to match the experiences of other prospective jurors to the evidence at trial. Off and on, for the next 18 pages of transcript, the prosecutor returned to the theme that might be described as, "The prosecution evidence must be true because something similar happened to several of the prospective jurors."

The majority has quoted at length of the prosecutor's other invocations of the experiences of the prospective jurors. There is no need to repeat them here.

I agree with the majority that the argument was

1

improper, at a minimum, because "it is misconduct for a prosecutor to base argument on facts not in evidence. [Citation.]" (*People v. Mendoza* (2016) 62 Cal.4th 856, 906.) Significantly, these were not just any "facts not in evidence," these were voir dire statements by prospective jurors who were not testifying but whose words would carry special weight, far beyond a remark improperly attributed to a person the jury had never seen. Referring to facts not in evidence has the serious potential of interfering with a fair trial. As our Supreme Court said just the other day, an argument based on facts not in evidence, " ' " 'although worthless as a matter of law, can be "dynamite" to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence.' " [Citations.]' [Citations.] ' "Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal." ' " (*People v. Rodriguez* (2020)9 Cal.5th 474, 480 quoting *People v. Hill* (1998) 17 Cal.4th 800, 828, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

Beyond referring to facts not in evidence, the prosecutor's argument seemed calculated to inflame the jury. This was a gang case – and the referenced voir dire passages all dealt with painful and sometimes horrific experiences the prospective jurors had had with gangs. Our Supreme Court has advised of the critical line between forceful advocacy and argument designed to inflame the passions of the jury. The "jury should not be given the impression that emotion may reign over reason. . . . [I]rrelevant information or inflammatory rhetoric that diverts the jury's attention from

2

its proper role, or invites an irrational, purely subjective response, should be curtailed." (*People v. Lewis* (1990) 50 Cal.3d 262, 284.)

At bottom, the prosecutor's argument violated a short but direct rule of law expressed by the Supreme Court in *People v. Freeman* (1994) 8 Cal.4th 450, 517: "[C]ounsel should not quote individual jurors in their argument to the entire jury." The prosecutor here did just that.

If this court had reversed defendant's conviction, we would have been required by statute to report the prosecutor to the State Bar, for such reporting is required, "[w]henever a modification or reversal of a judgment in a judicial proceeding is based in whole or in part on the misconduct, incompetent representation, or willful misrepresentation of an attorney." (Bus. & Prof. Code, § 6086.7; see also *People v. Hill, supra,* 17 Cal.4th at p. 853, fn. 13 [reversal of murder conviction for prosecutorial misconduct required Supreme Court to notify State Bar].)

I agree with the majority that the evidence against defendant was overwhelming, and reversal is not required. There will be no report to the State Bar. Nevertheless, it may be time to bring forward the words of our first district in *People v. Lambert* (1975) 52 Cal.App.3d 905, 911–912:

"Despite our conclusion that the misconduct here was nonprejudicial, we feel compelled to forewarn prosecutors that we have too often of late been faced with the task of determining whether unnecessarily zealous prosecutors have committed misconduct, and if so, determining whether, on the basis of the whole record, that misconduct was prejudicial. Frequently, it seems that deputy district attorneys see their sole function as

3

winning cases even at the expense of a fair trial for the defendant and the proper administration of justice in the courts. These excesses then force the Attorney General's office into often extreme positions in an effort to justify the prosecutor's actions. The Attorney General might consider whether it is more profitable to spend some time schooling such individuals in proper prosecutorial conduct. Certainly the courts' time could be better spent than having to review the entire record in numerous cases to determine whether a reversal is mandated by prosecutorial misconduct or not.

"While this court is not inclined to find prosecutorial misconduct where we feel none exists, we do feel that the instances of such improprieties have come before us too often. Similarly, while we are not inclined to find such conduct prejudicial if the record does not warrant such a conclusion, we feel compelled to warn prosecutors that they cannot continue with impunity to engage in such conduct thinking that appellate courts will save them by applying the harmless error rule. Convictions have been reversed before, and will continue to be, whenever prejudicial misconduct occurs. The Attorney General, district attorneys, and deputy district attorneys should take appropriate steps to minimize such occurrences." (See also *People v. Denard* (2015) 242 Cal.App.4th 1012, 1023, fn. 4; *People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1537.)

RUBIN, P. J.

4

The People v. Andres Lima
B293030


BAKER, J., Concurring



I join the opinion for the court, but I write separately to acknowledge, in one respect, some uncertainty about the impact of our resolution of this appeal will have.

Our Supreme Court granted review and transferred this case back to us "with directions to vacate [our] decision and reconsider the cause in light of Senate Bill No. 775 (Stats. 2021, ch. 551) [SB 775]." There is some ambiguity in those directions because SB 775 primarily amends the Penal Code statute that permits a defendant to petition for a recall of his or her sentence (Pen. Code, § 1170.95, subd. (a)) whereas defendant has not (so far as our record reveals) filed a Penal Code section 1170.95 petition; he is before this court on direct appeal.

Penal Code section 1170.95, as amended by SB 775, provides in subdivision (g) that "[a] person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to [Penal Code] Sections 188 and 189 by Senate Bill 1437 (Chapter 1015 of the Statutes of 2018)." That is presumably why our Supreme Court has returned the cause to us. But the governing rules for resolving a direct appeal are different than the rules that govern resolution of a Penal Code section 1170.95, subdivision (a) petition. And I believe the

difference could matter, procedurally speaking, if there are future Penal Code section 1170.95 proceedings involving defendant.

Under Penal Code section 1170.95, subdivision (d), a defendant who petitions for recall of sentence and establishes his or her prima facie eligibility is entitled to a determination by the trial judge addressing whether he or she could still be convicted of a qualifying crime (e.g., attempted murder) beyond a reasonable doubt—and the defendant may "offer new or additional evidence" bearing upon the question.  (Pen. Code, § 1170.95, subd. (d)(3).)  If defendant files a Penal Code section 1170.95 petition (assuming he has not already), he may able to show he is entitled to a Penal Code section 1170.95, subdivision (d) hearing notwithstanding today's opinion because our Supreme Court has held a trial court cannot rely on a weighing of the trial evidence to find the prima facie threshold has not been met.  (See, e.g., *People v. Lewis* (2021) 11 Cal.5th 952, 971.)  In other words, the impact of today's holding as to defendant's challenge to his attempted murder conviction may be limited because part of the rationale this court articulates for resolving that challenge may not suffice to deny him a Penal Code section 1170.95, subdivision (d) hearing.


BAKER, J.


2